IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TATE ACCESS FLOORS, et al.    *
    *
    *
v.    *    CIVIL NO. JFM-00-2543
    *
    *
INTERFACE ARCHITECTURAL    *
RESOURCES, INC.    *

**OPINION**

Tate Access Floors, Inc., and Tate Access Floors Leasing, Inc. [collectively "Tate"],

move for a preliminary injunction against Interface Architectural Resources, Inc. ["Interface"],

for infringement of claims 1-4 and 8-10 of U.S. Patent No. 4,625,491, a patent on a design for an

access floor panel.  Tate has previously successfully asserted rights under the same patent against

a different defendant before this Court and the Federal Circuit.  Tate Access Floors, Inc. v.

Maxcess Techs., 222 F.3d 958 (Fed. Cir. 2000) [Maxcess].  I heard oral argument on the pending

motion on January 10, 2001.  A preliminary injunction will be granted.

I.

"Elevated floors, also known as 'access floors,' typically include an array of square floor

panels that are supported at their corners by pedestals, thus providing a space underneath the

floor through which wires and other equipment may be routed."  Maxcess, 222 F.3d at 961.

Individual panels can be removed for access to equipment between the access floor panels and

-1-



the sub-flooring. Access to wiring and other skeletal parts of a building tends to be easier and less expensive through access floor panels than through walls or ceilings. Access floor panels can be covered with carpet or any other type of flooring.

The top parts of access floor panels are mounted on steel frames, the construction and design of which are irrelevant to the patent at issue, except for the point that in the past some frames were made partly of wood, requiring fire-retardant treatment. The top parts of access floor panels are commonly made of high pressure laminate, or HPL ["laminate"]. Laminate is made of multiple layers of kraft paper, with a top decorative layer and a transparent layer over that, all forced together under high pressure with resin. See, e.g., Opp'n Ex. 1 at col.3 ll.18-44. Laminate is used in many applications other than access floor panels.

Frank Gibson applied for the patent Tate now holds on January 13, 1986. At that time (and as of Gibson's invention date of December 21, 1983), the desirability of cutting the edges of laminate at an angle, to prevent splintering, chipping, and damage from sharp perpendicular edges, was taught in textbooks, without specific reference to access floor panels. Opp'n Exs. 25B, 26, 28, 30B at WPL-8, 30C at 117. In addition, as of 1981 the standards of the National Electrical Manufacturers Association ["NEMA"] instructed the worker to "[c]hamfer all exposed edges of decorative laminates by filing to prevent possible damage by chipping." Opp'n Ex. 30E at 14.

The standard access floor panels that were sold at the time of filing, in a style that is still on the market, have different designs, but commonly have an attached trim around their edges. See, e.g., Opp'n Ex. 18 at IP0000183 (showing early floor panel with "edge trim"). The trim is a separate piece of material. It prevents chipping and unattractive marks at the edges of panels, but

-2-

has several drawbacks. It raises the costs and time of production and installation. Because the trim has to be a separate piece, there is a limit on how thin it can be, limiting the aesthetic potential for a thin border. When such panels are in place in a floor, the attached trim has grooves that tend to collect water and dirt, and the trim may break or come loose, creating maintenance problems. Finally, the dimensions of the panel can be more accurate when a separate trim is omitted. Opp'n Ex. 1 at col.2 ll.4-21, col.2 l.64 - col.3 l.17.

Well before the dates of invention and filing, companies including both Tate and Westinghouse, a predecessor of Interface, sold panels with laminate tops. Opp'n Ex. 30 at ¶¶ 6, 11, 12. See also Opp'n Ex. 18 at IP0000179 (indicating square-edged laminate panels from another early manufacturer). Tate sold trimmed panels, Opp'n Ex. 18 at IP0000172, IP0000174, but also made them available without trim: "Vinyl trim edges are normally supplied, but can be eliminated at the architect's or owner's election." Opp'n Ex. 18 at IP0000174. Nothing in the early Tate literature in the record indicates how the untrimmed panels were edged and whether or how the edge treatment revealed the inner parts of the laminate at the edge. Tate's expert, Steven Cline, remembers seeing a few products on the market with untrimmed laminate tops, without a bevel at the edge. Opp'n Ex. 56 at 76-78.

Westinghouse plainly sold trimmed panels before Gibson filed his patent application, but the evidence as to whether it sold untrimmed panels is conflicting. Richard Talcott, who worked as materials manager and in other positions at Interface or its predecessors, including Westinghouse, describes hand-beveling of the edges of the laminate at an angle of about forty-five degrees. The beveling removed some of the top decorative layer of paper and revealed some kraft paper. Talcott also declares that "[a]n extruded plastic trim strip was typically, but not

-3-

invariably, applied to the panel edge." Opp'n Ex. 30 at ¶ 8. A former sales manager of Interface and its predecessors, Thomas D. Bougie, had responsibility for selling access floor panels for the companies from 1967 to 1999. Bougie said that the only untrimmed panels he sold were topped with carpet, not laminate. Bougie said that laminate panels sold by Westinghouse were beveled to be widest at the top, to create an air-tight seal to insulate the air conditioning in the computer rooms in which the panels are typically used. Reply Ex. 27 at ¶7.

The available written evidence does not show sales of an untrimmed laminate panel beveled like the accused panel. An "architectural catalogue file" describing certain Westinghouse access floor panels shows "vinyl edge trim" wherever it appears to be specific about the panels' upper edges. Opp'n Ex. 18 at IP0000159. The brochure advertising the Westinghouse panels specifies that "[a]n extruded trim edge of fire retardant rigid vinyl flush with the surface of the floor covering shall completely encase the edge of the panel." Opp'n Ex. 30A at IP0000195. Although the fire-retardant covering might have been necessary because the bases of the panels were then made of wood, the description of the covering as "flush with the surface of the floor covering" is precise. The advertisement further emphasizes that the panels' "[v]inyl edges butt together precisely to form an air-tight air conditioning plenum." Opp'n Ex. 18 at IP0000193.

Tate's patented panel, sold under the trade name Integral Trim, has recessed edges but no attached trim. The decorative top layer does not extend horizontally to the side of Tate's panel. Instead the decorative layer is cut away, making both the edges of lower layers that partially constitute the laminate and a wider strip of one layer visible around the edges of the panel. This design overcomes the production and maintenance problems posed by attached trim, while

-4-

generating a contrasting border. A floor made of such panels has a grid pattern made of the contrasting borders around rows of square panels. The diagram in Tate's patent shows that at the extreme edge of the laminate portion of the panel, there is a flat section of one of the lower layers that comprise the panel. An angled section revealing the edges of each layer slopes from the flat edge to the flat center of the panel, with the decorative layer.

The patent examiner who approved Tate's patent considered prior patents on designs involving laminate with angled edges: one granted in 1960 (U.S. Patent No. 2,957,737), and one granted in 1955 (U.S. Patent No. 2,717,187). Opp'n Ex. 15. The 1960 patent involved a way to finish the edges of table or desk tops made of laminate by attaching an additional layer at the edge. The patent explains that the edge layer should be angled to reduce "feathering" of the laminate layers while the layer is attached and that the difference in color "lends a decorative effect." The 1955 patent shows a beveled laminate top on a table with a lower edging that sticks out further than the edge of the laminate. A prior British patent involved a way to attach edging to a metal desk or table top, which edging "may be suitably rounded off to impart a finish to the desk or table." Opp'n Ex. 17 at 2 ll. 24-25. The examiner also considered several prior patents on other aspects of access floor panels, one of which showed a separate trim edging around the top of the panel. Opp'n Ex. 15.

The patent examiner approved the application, giving a one-sentence explanation that the "references of record fail to show an integral trim exposing a lower decorative layer." Opp'n Ex. 15.

Claim 1 of Tate's patent covers a panel with "a border along the edges of said panel along which said decorative surface layer is removed to expose said inner body portion and thereby

-5-

provide an integral contrasting border around said decorative surface layer," also described, in the other independent claim, claim 8, as "a border extending along the edges of said panel along which the decorative layer is removed to expose said inner layer." Mot. Ex. 1 at col.5 ll.8-11, col. 6 ll.9-11. The other claims at issue are dependent to these two independent claims. Claims 3 and 9 specify "at least two of said inner layers remaining along said border" (claim 3 says two "inner body layers"). Mot. Ex. 1 at col.5 ll.18-19, col.6 ll. 14-16. Claims 2 and 4 go to uniform color, thickness, and use of resin, factors that apparently do not differ between the accused and the patented panels. Mot. Ex. 1 at col.5 ll.14-15, 21-23. Claim 10 specifies that the laminate includes at least four inner layers of paper "and at least one inner layer is removed along said border." Mot. Ex. 1 at col.6 ll.18-20.

Tate successfully asserted its rights under the patent at issue against Maxcess Technologies in the District of Maryland and Federal Circuit. Maxcess, 222 F.3d 958. Maxcess's infringing panel, sold under the trade name Duratrim, was flat at the extreme border and otherwise structurally resembled Tate's. The flat outer edge of Maxcess's panel was brown kraft paper, later painted black. Maxcess argued unsuccessfully to the jury that several men, including Alwyn Wiebe, were the true inventor of the design on which Tate now holds the patent. Maxcess also failed to narrow the scope of Tate's patent to exclude laminate whose kraft paper layers were brown.

Maxcess currently sells an untrimmed access floor panel under the trade name SpecTrim. Tate acknowledges that SpecTrim does not infringe its patent. Opp'n Ex. 57 at 10-11. Tate's patented panel has competed with both the accused panel and Maxcess's SpecTrim panel on at least one job. Opp'n Ex. 57 at 74.

Interface describes its untrimmed accused panel, sold under the trade name Bevel Edge, as "beveled." Mot. Ex. 8 at 9. In one brochure, it advertises the panel as follows: "the top of the high pressure laminate is beveled to create a grid pattern without the use of separate edge trim pieces." Mot. Ex. 8 at 9. The extreme edge of the panel is not a flat portion of the lower layer, but an angled cut-away section apparently revealing the edges of each layer, rising to the top layers of the panel, the transparent and decorative layers. The top part of the panel is widest at the bottom and narrowest at the top, with an angled edge. Opp'n at 2. The edges of Bevel Edge panels are less uniform than the edges of Tate's panels. Several managers at Interface had knowledge of Tate's patent before Interface began to make and sell the accused panel. Mot. Ex. 5 at ¶¶ 19-20.

Tate learned of the accused panel from a brochure in March 2000. Opp'n Ex. 57 at 24. It obtained a copy of the panel in August 2000. Mot. Ex. 5 at ¶ 16; Reply Ex. 28 at 43-44.

At oral argument on the motion, Interface informed the Court that it is testing another type of panel, and showed the Court and Tate's witnesses samples of this second panel as well. The top of the second Interface panel is a square of laminate, the edges of which have been hand-filed to remove burrs and other irregularities. The samples of the second panel that were presented at the hearing had edges that were far closer to vertical than were the edges of the samples of the accused panel. Interface calls the second panel "Bevel Edge" as well. It will not commit to abandon the accused panels permanently. The remainder of this opinion will use "Bevel Edge" to refer to the accused panels.

When a set of Tate's panels are laid together, a person standing on them and looking down sees the black edges of each panel forming a grid. Any spaces between the panels, being

-7-

dark as well, blend into that uniform grid-like pattern. When a set of the accused panels are laid together, a person standing on them and looking down sees a grid formed both of occasional dark spaces between the panels and of the brown angled edges of the panels.

The total sales of the two plaintiff companies in 1999 were under $100 million. The total sales of the company that owns Interface in 1999 exceeded $1.2 billion. In December 2000, the holding company that owns both plaintiff companies announced its merger with Kingspan Group P.L.C., a much larger company. Opp'n Ex. 72.

Demand for access floor panels was extremely high in 2000. Opp'n Ex. 32 at ¶¶ 26, 29. Victor Sainato of Interface says that Interface expects that in 2001 industry capacity will substantially exceed demand. Opp'n Ex. 32 at ¶ 29. Tate individually has capacity problems as well.

## II.

District courts may grant preliminary injunctions and other equitable relief in patent cases under 35 U.S.C. § 283. Under Federal Circuit case law, see, e.g., T. J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc., 821 F.2d 646, 647 (Fed. Cir. 1987), to obtain a preliminary injunction, Tate has the burden to show:

> (a) likelihood of success on the merits;
> (b) irreparable harm in the absence of an injunction;
> (c) that the balance of hardships weighs in its favor; and
> (d) public policy in its favor.

The Federal Circuit has emphasized that district courts should make findings of fact, discuss each of the four factors, and weigh all four factors. Nutrition 21 v. United States, 930

F.2d 867, 869 (Fed. Cir. 1991); Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1555 (Fed. Cir.

1994); Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1988). Ordinary principles

of claim and issue preclusion govern the applicability of the Federal Circuit's construction of

claims of Tate's patent in Maxcess.  See, e.g., Phonometrics, Inc. v. Northern Telecom Inc., 133

F.3d 1459, 1464 (Fed. Cir. 1998).

A.

The patent holder must establish a likelihood of success on the merits of (1) validity and

(2) infringement of its patent.  See, e.g., Hybritech, 849 F.2d at 1451.

1.

A United States patent is presumed to be valid.  35 U.S.C. § 282.  In the analysis

beginning from that premise, a prior adjudication of validity may be given "considerable weight"

but does not bind a later court.  Hybritech, 849 F.2d at 1452.  Despite the presumption of

validity, a patentee moving for a preliminary injunction has "the normal burden" of

demonstrating likely success at trial on the merits of validity and all other issues.  New England

Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882 (Fed. Cir. 1992).  The patentee must

show that the defendant's defense lacks substantial merit, 970 F.2d at 883, or that the defendant

is not likely to prove invalidity by clear and convincing evidence at trial.  H.H. Robertson Co. v.

United Steel Deck, Inc., 820 F.2d 384, 387 (Fed. Cir. 1987), abrogated on other grounds,

Markman v. Westview Instruments, Inc., 53 F.3d 967, 977-79 (Fed. Cir. 1995) (en banc), aff'd,

517 U.S. 370 (1996).

Interface argues that Tate's patent is invalid because Alwyn Wiebe, not Franklin Gibson, the inventor listed on Tate's patent, invented Tate's panel. In Tate v. Maxcess, Maxcess made the same claim, and the jury found that Maxcess had failed to prove that Gibson was not the inventor. Mot. Ex. 6 at 3. Interface does not contend that it has any evidence supporting the claim that Wiebe was the true inventor that was not presented to the Maxcess jury.[1] The weight given to a prior adjudication strongly favors Tate.

Interface also argues that Tate's patent, extended to cover Interface's panel, would be invalid for obviousness, because Interface's panel relies on prior art that had been around for decades, a "simple bevel." As a preliminary matter, Tate cites the Maxcess jury verdict on this issue as well. Because both Maxcess's and Tate's panels had a flat edge beyond the angled or beveled section, any issue related to beveling alone had no apparent or central place in that litigation.

Tate must show a likelihood of success on validity, and therefore on obviousness. Obviousness as a matter of law depends on four factual questions: 1) the scope and content of the prior art; 2) ordinary skill in the art; 3) differences between the invention and the prior art; and 4) secondary considerations including "commercial success, long-felt but unresolved need,

---

[1] Interface attempts to distinguish the jury verdict on inventorship in Tate v. Maxcess because the defendant, Maxcess, also argued to the jury, in the alternative, that people other than Gibson and Wiebe had actually invented the design. In a special verdict, the jury answered 'no' to the question "Do you find that Maxcess has proven, by clear and convincing evidence, that Mr. Gibson was not the inventor of any claim of the Tate Patent?" Mot. Ex. 6 at 3. Because Maxcess argued to the jury that Wiebe, among others, was the true inventor, the prior adjudication did address the point Interface raises.

failure of others, copying, and unexpected results." Ruiz v. A.B. Chance Co., 234 F.3d 654, 662-63 (Fed. Cir. 2000) (citations omitted).

To argue that beveling the edge of an untrimmed laminate panel was part of the ordinary skill in the art under factor 2, Interface cites textbook and prior art recommending the beveling or other rounding of laminate edges; prior patents involving beveled laminate edges; and the prior existence and sale of untrimmed, beveled, laminate panels. The textbooks establish that beveling the edges of laminate in other contexts was part of the ordinary skill in the art. Reply Ex. 33 at IP0000035 (revealing multiple treatments for laminate edges in general, including trimmed, beveled, and otherwise shaped). But though beveling the edges of laminate in general was obvious, beveling the edge of floor panels to sell them without expensive additional trim might not have been. Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1556 (Fed. Cir. 1985). That beveling as a technique was in the prior art does not mean that beveling the panel edges for sale, thus creating a decorative contrast that produces a grid pattern and avoids chipping from abutting edges of decorative surface layer, was obvious. For example, one textbook teaches beveling the edges of adjoining sections of laminate so that they would be widest at the top. This way of beveling is the reverse of the angle used by Interface and Tate. Reply Ex. 33 at IP0000039; but see Reply Ex. 33 at IP0000023 (showing a beveled edge that is not on a panel that is angled as on Interface's accused panel).

Ordinary skill in the art of making floor panels did not include decorative beveled borders. The prior patents showing laminate with beveled edges were not on floor panels. Some also covered products that had additional attached edges (like the prior art trimmed floor panels that the patent plainly does not cover). Opp. Ex. 16-17. The metal table patent does cover a

-11-

laminate edge for a metal table, in which the laminate is an edge trim on a metal desk, and the laminate itself is supposed to be rounded off somehow. The laminate desk or table top patent has an add-on trim that juts out below the beveled laminate edge.

As a secondary consideration under factor 4, the omnipresence of relatively expensive added trims in the market before the issuance of Tate's patent strongly suggests that the potential use of beveling to solve the problem of chipped edges was not obvious. Other secondary considerations include the undisputed commercial success of Tate's product and its copying by at least one major participant in the market, Maxcess.

The remaining evidence of obviousness, under factors 1 and 3, involves the prior art in floor panels. Whether Interface is practicing the prior art constitutes an affirmative defense to infringement. Fiskars, Inc. v. Hunt Mfg. Co., 221 F.3d 1318, 1323 (Fed. Cir. 2000). I address this issue in discussing infringement.

2.

Infringement analysis has two steps: claim construction and comparison of the accused product to the patented design. Hybritech, 849 F.2d at 1455. Claim construction begins with intrinsic evidence: first the claims themselves, then the specification, and then the prosecution history. Interactive Gift Express, Inc. v. Compuserve Inc., 231 F.3d 859, 865 (Fed. Cir. 2000). In the case at bar, the Federal Circuit's prior construction of the patent is also relevant. A "court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." Johnson Worldwide Assocs. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). Only if the intrinsic evidence is

-12-

unclear should a court consider extrinsic evidence. 231 F.3d at 866. On claim construction,

Interface makes two main arguments: that the term "border" should be construed to mean a

"recessed horizontal border formed of a single layer," and that Tate's patent cannot be reasonably

construed to cover Interface's panel.

Interface's proposed claim construction requires that the border be horizontal and that it

be formed of a single layer. The Federal Circuit construed an "integral contrasting border" in

claim 1, like a "border" in claim 8, to mean "an edge or trim formed by removing the edges of the

decorative surface layer to uncover or reveal the inner body portion." 228 F.3d at 967, 968.

Nothing in the Federal Circuit's construction of "border" and its variant supports Interface's

argument, but Interface's proposed construction could supplement the appeals court's

construction.

Claim 1 describes "a border along the edges of said panels along which said decorative

surface layer is removed to expose said inner body portion and thereby provide an integral

contrasting border around said decorative surface layer." Mot. Ex. 1 at col.5 ll.8-11. The term

"inner body portion" does not restrict the border to a single layer of paper, nor to being

horizontal.

Nothing in claim 1 requires a flat border, because claim 1's term "inner body portion" is

not singular, but in claim 8, the term "inner layer" is singular and could be read to require a

border made of a single layer, and thus, given the construction of the laminate, flat. The Federal

Circuit construed "inner body portion" and "inner layer" to have the same meaning, "because

they are used interchangeably in the specification." 222 F.3d at 968. The term "inner body

portion" means "the layers of laminated material that are located "rearward," i.e., below, the

-13-

decorative surface layer, and that contrast in color with the decorative surface layer." 222 F.3d at

966. The court's ruling that it viewed the terms "inner body portion" and "inner layer" as

synonymous could cut either way: it might mean that the "inner body portion" is a single piece

of paper, or that the "inner layer" is a term for all of the kraft paper below the top decorative

layer. Two other references to what exactly shows at the edges of the patented design are

conflicting, one singular and one plural. "[I]t is clear from the written description that the edges

of the decorative surface layer are removed to expose the inner body portion in order to make *the

backing layers* visible and to provide a trim that is aesthetically pleasing." 222 F.3d at 967

(emphasis added). Elsewhere, the court referred to a singular layer in explaining that "the edges

of the floor covering are "scarfed," i.e., cut away, to expose *one of the backing layers* . . . thereby

providing an integral border or edge trim." 222 F.3d at 962 (emphasis added).

Beyond its mixed use of singular and plural terms, relevant analysis by the Federal

Circuit does not support Interface's restrictive construction of the independent claims. The court

said that the "inner body portion" does not have to have a "single uniform appearance"; rather,

the patent only requires a contrast between the decorative layer and the inner body portion. 222

F.3d at 966. The court said that "the term "inner" merely denotes that the "inner body portion" is

located inside or within the decorative surface layer." 222 F.3d at 965. The "inner body portion"

may consist solely of brown kraft paper, as does the beveled edge of the accused panel. 222 F.3d

at 966, 969-70.

The Federal Circuit uses both singular and plural terms for what is revealed on the border.

Linguistic analyses of the court's claim construction may be misleading, because the court was

not considering the question at issue in this litigation. The court's plural language supports

-14-

Tate's position. If the angled part of Tate's panel that shows multiple layers is part of the border, then the border need not be flat nor made of a single layer. The court separately emphasized that "it is generally accepted in patent parlance that 'a' or 'an' can mean 'one or more,'" suggesting that a plural interpretation should trump a singular interpretation. 222 F.3d at 966 n.4 (citation omitted). At the least, the Federal Circuit's approach does not compel a more restrictive reading of "border."

Looking beyond the Federal Circuit's construction, the patent as a whole does not support Interface's proposed construction. To require that a "border" be flat or horizontal would not give "full effect to the ordinary and accustomed meaning" of the word. 175 F.3d at 989. Likewise, nothing beyond the word "border" in claims 1 and 8 requires that the "integral contrasting border" or "border" be flat. The dependent claims at issue, too, are clear, and nothing in them requires a flat border. Dependent claims 3 and 9 specify "at least two" inner layers or inner body layers "remaining along said border." The edge of the accused panel shows the edges of more than two layers all "remaining along said border." Nothing in any of the claims at issue requires that the "border" or "integral contrasting border" be "formed of a single layer."

Beyond the claims, the patent does not further Interface's argument. Although the claims should be read in light of the specification, a court should not read a limitation from the specification into the claim. See, e.g., Commerce Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998). I have already explored the contradictory use of singular and plural terms in discussing the Maxcess opinion. The patent's summary of the Tate invention says that "the surface layer of protective material and the layer of decorative paper are cut away along the edge of the floor covering to expose the inner layers and provide a contrasting color

-15-

integral border." Mot. Ex. 1 at col1 l.67. The reference to "expos[ing] the inner layers" does not

support Interface's reading that one layer must be particularly exposed or that the contrasting

border must be flat. Interface's argument that the arrows in Tate's patent drawing, labeled

"border or trim," Patent at col. 2, l. 54, point to the horizontal part of the edge, not the angled part

sloping up to the top decorative layer, is inconclusive. Opp'n at 18. If the angled part were

separately labeled as something else, Interface might have a stronger argument on this point.

Finally, the prosecution history does not compel Interface's restrictive construction of the

term "border" or "integral contrasting border." The examiner explained that the "references of

record fail to show an integral trim exposing a lower decorative layer." Opp'n Ex. 15. The

accused panel's angled edge surface is both "lower" and "decorative." It is below the plane of

the top of the panel, and it both contrasts with the surface of the panel and is advertised by

Interface to do so. The surface at the edge of Interface's panel is arguably not "a . . . layer" at all,

since it is composed of the edges of many layers of kraft paper. However, given the Federal

Circuit's ruling that the terms "inner body portion" and "inner layer" were used interchangeably

in the patent, the singular word choice of the examiner is not itself enough to narrow the ordinary

meaning of the words in the claims themselves.

Reading the patent itself as a whole, and in light of the Federal Circuit's constructions, I

do not agree with Interface's requested claim constructions. Nor do I agree that the patent cannot

reasonably be construed in accordance with Tate's motion. The accused panel has a

"contrasting" border, visible from above, and the decorative layer has been cut away to reveal

that border. The claims can rationally be construed to cover Interface's panel. Cf. Interactive

Gift Express, 231 F.3d at 867 (finding "nothing precluding" a basic reading of a claim term).

The second stage of infringement analysis is a comparison of the patented design to the accused panel.[2]  As an affirmative defense to infringement, Interface argues that its panel relies on prior art dating back decades.  Interface cites textbook and prior art recommending the beveling or other rounding of laminate edges; prior patents involving beveled laminate edges; and the prior existence and sale of untrimmed, beveled, laminate panels.  I have discussed the first two types of evidence in considering the "obviousness" attack upon the patent's validity.

As for the prior art in access floor panels, Interface's evidence related to Tate's old panels shows that panels without separate trim were available, but is silent as to whether or how they were beveled.  Interface has not shown that it is practicing the prior art in floor panels as practiced by Tate.

I find that Tate is likely to succeed on the merits against Interface's prior-art defense based on Westinghouse panels as well.  Interface argues that before the patented design was invented, Westinghouse sold untrimmed laminate panels beveled in the way that the accused panels are beveled.  The conflicting testimony as to Westinghouse's prior-art panels is not enough to defeat a likelihood of success on the merits for Tate.  Interface cites testimony by Richard Talcott that Westinghouse sometimes sold laminate panels with beveled edges and no additional trim.  Opp'n Ex. 30 at ¶ 8 ("An extruded plastic trim strip was typically, but not invariably, applied to the panel edge."); id. at ¶ 11 (describing planing to a 45-degree angle).  Thomas Bougie, who sold access floor panels for Westinghouse and its successors including Interface, says he never saw or sold an untrimmed laminate panel.  Although Talcott's personal

---

[2] As I have explained, the obvious structural differences between Maxcess's infringing panel and Interface's accused panel make the Maxcess decision irrelevant on this point.

experience of buying the files establishes that laminate panels were beveled, that they were then sold without trim is not shown. Bougie's responsibilities in sales make it at least as likely that he would know of how panels were actually sold as would Talcott, who worked in manufacturing. The written information supports Bougie, not Talcott. Although the issue is a somewhat close one, I find a likelihood of success for Tate.

Tate's patent cannot cover a square-edged panel (a panel whose edge is perpendicular to the decorative surface layer), as such panels were undisputedly in the prior art. Interface suggests that if Tate's patent covers all beveled panels, it must cover panels where the edge of the panel is inclined at one degree from perpendicular, but that such a slightly inclined panel edge could hardly constitute decorative trim as described in Tate's patent. The patent emphasizes an "integral contrasting border," however, and I find that the accused panel can reasonably be said to have such a border. Inspection of samples of the accused panels from above reveals a bevel at an angle that creates a contrasting line around the panels, although the contrast between the gray decorative surface layer and brown kraft paper is not extreme. In addition, Interface advertises that the beveling "create[s] a grid pattern without the use of separate edge trim pieces," clearly emphasizing that a visible border is created. I do not find Interface's one-degree argument persuasive in considering the accused panels.

B.

To show irreparable harm, a patentee must show "objective proof" of a "specific injury" that may occur in the absence of an injunction. High Tech. Med. Instrumentation v. New Image Indus., 49 F.3d 1551, 1556-57 (Fed. Cir. 1995) (finding no irreparable harm where patentee

-18-

neither makes nor licenses the protected product). A patentee may be entitled to a presumption of irreparable harm if it makes a "clear showing" or a "strong showing" of validity and infringement. Nutrition 21, 930 F.2d at 871; Bio-Tech. Gen. Corp. v. Genentech, 80 F.3d 1553, 1565-66 (Fed. Cir. 1996). Past testing of the patent in litigation contributes to such a presumption. Id. If the patentee establishes such a presumption, the defendant must then provide "persuasive evidence to rebut the presumption of irreparable harm." 80 F.3d at 1566.

Tate has made a strong showing of validity. Despite the conflicting evidence as to the prior art Westinghouse panels, Tate's own showing on infringement is quite "clear." Accordingly, I find that Tate is entitled to the presumption of irreparable harm. Because of the conflicting evidence on the Westinghouse issue, however, I will evaluate Tate's case on irreparable harm both in the light of the presumption and as if I had not found a presumption to be appropriate.

Other factors contributing to the analysis of irreparable harm include a party's delay before seeking a preliminary injunction, Hybritech, 849 F.2d at 1457, loss of revenues and good will, Bio-Tech, 80 F.3d 1566, a need to reduce research and development activities, Bio-Tech, 80 F.3d 1566, and harm to reputation if the party still produces the infringed product, Reebok, 32 F.3d at 1558. Harm to the statutory right to exclude does not in itself justify a preliminary injunction, as it would make them a matter of course. Reebok, 32 F.3d at 1557-58. Factors weighing against a presumption or finding of irreparable harm include the defendant's ceasing or promising to cease the alleged infringement and "a pattern of granting licenses under the patent." Polymer Techs. v. Bridwell, 103 F.3d 970, 974 (Fed. Cir. 1996).

If Tate unreasonably delayed in seeking a preliminary injunction, that delay would weigh against a preliminary injunction. Tate admits knowing of the accused panel in March 2000, five months before it filed suit. Opp'n Ex. 57 at 24. Tate emphasizes that it did not get an actual copy of the accused panel until August 2000, and that it could not sue before it had a copy. Reply at 25; Mot. Ex. 5 at ¶ 16; Reply Ex. 28 at 43-44. Interface's arguments that former Interface employees earlier joined Tate with knowledge of the accused panel do not show that Tate had a copy of the panel. Tate correctly argues that it could not sue on the sole basis of advertisements for a potentially infringing product. I find that Tate did not unreasonably delay in bringing suit.

Interface argues that no special niche exists in the market for Tate's patented access floor panels. See Opp'n Ex. 32 at ¶ 23 (noting the belief of an Interface employee that no such niche market exists). Cf. Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268, 276 (Fed. Cir. 1985) (finding, in lost-profits analysis, a "'special niche' or a mini-market" because comparable products "are not equal or equivalent" in meeting "the specific needs of this relevant market"). The Federal Circuit found a special niche for untrimmed panels in Maxcess, citing "substantial evidence that other floor panels with add-on trims were not acceptable as substitutes" for certain customers. 222 F.3d 971. Interface argues that the presence in the market of a non-infringing, untrimmed Maxcess product alters the market analysis. However, panels like the square-edged Maxcess panel were part of the prior art; their shortcomings are discussed in the patent at issue. The market niche for Tate's panel exists because the patented design avoids both the problems posed by extra trim (in trimmed panels) and the problems caused by abutting edges of decorative surface layers (in untrimmed panels without a recessed edge). Interface points to one sale in

-20-

which Maxcess's non-infringing product won a bid over the Tate product. Without greater

evidence as to elasticity of demand or customer preference, I see no reason to view Maxcess's

non-infringing product as a competitor in the particular market niche that the Federal Circuit saw

Tate's panel to occupy. Cf. Yarway, 775 F.2d at 276 (discussing acceptable substitutes in the

context of lost-profit analysis); Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1162

(Fed. Cir. 1978) (same). Tate's panel occupies a market niche for untrimmed panels with edges

that are recessed so that the edges of the decorative surface do not abut and thus chip over time.

Interface argues that its panel with beveled edges is not part of a special market for

untrimmed panels with recessed edges, because "a bevel is not a recess, as anyone can see."

Opp'n at 28-29. Tate's preferred embodiment leaves empty space, horizontally within the outer

rim of the panel and vertically below the plane of the highest surface, the decorative layer. A

bevel creates a similar space, as anyone can see. A "recess" does not have to have a flat bottom.

Both spaces avoid the chipping of abutting decorative layers and may visually create a decorative

border. The accused panel also currently occupies the market niche for untrimmed panels with

recessed edges.

Interface argues that it plainly can afford to satisfy a judgment and that where money is

available to satisfy a judgment, irreparable harm is not threatened. The Federal Circuit has noted

that "it is well-settled that, because the principal value of a patent is its statutory right to exclude,

the nature of the patent grant weighs against holding that monetary damages will always suffice

to make the patentee whole." Hybritech, 849 F.2d at 1456-57. The court has found money

damages sufficient where the patent-holder no longer produces under the patent. Reebok, 32

F.3d at 1557-58. Tate, however, produces a patented product. Interface's ability to satisfy a

judgment does not alone preclude an injunction. "If monetary relief were the sole relief afforded by the patent statute then injunctions would be unnecessary and infringers could become compulsory licensees for as long as the litigation lasts." Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1233 (Fed. Cir. 1985).

Interface argues that loss of individual sales could be fully redressed with money damages after trial. Mere "potential loss of market share" has been found to indicate irreparable harm, Canon Computer Sys. v. Nu-Kote Int'l, 134 F.3d 1085, 1090 (Fed. Cir. 1998), and Tate clearly risks loss of market share in the niche market I have discussed. In addition, as customers for access floor panels tend to stick with a given supplier of floor panels, Tate is losing long-term customers, not just individual sales. Opp'n Ex. 46 at ¶ 8 (describing Interface's new long-term relationship with AT&T as a client). Such a loss exceeds the simple value of profits on individual sales lost.

Interface argues that Tate lacks the manufacturing capacity to meet the high demand for its tiles, and that it therefore suffers no irreparable harm. With Tate's capacity maximized, in this view, orders denied to Interface would go to non-infringing competitors of Tate, especially to Maxcess's new non-infringing untrimmed panel, but not to Tate itself.

As a legal proposition, whether a patent holder is suffering irreparable harm could turn on its manufacturing capacity.[3] The ability to meet market demand is indeed a factor in lost-profit

---

[3] The support Interface cites for that proposition, a Federal Circuit case upholding administrative findings under a different statute, is not persuasive. Corning Glass Works v. United States Int'l Trade Comm'n, 799 F.2d 1559, 1569 (Fed. Cir. 1986). The Corning court ruled on unfair trade practices under the Tariff Act, finding sufficient evidence to support an administrative law judge's finding that importation of foreign products did not harm the domestic market where domestic producers lacked capacity to fill the orders. A sale of a (presumably

analysis after infringement has been found, to determine whether the patent holder should

recover lost profits or royalties. See, e.g., Yarway Corp. v. Eur-Control USA, Inc., 775 F.2d 268,

276 (Fed. Cir. 1985). If the holder could have produced under the patent, it can recover lost

profits; if not, it can recover only royalties. If Interface could show that Tate could not benefit at

all, or could benefit only minimally, from an injunction, the analogy to lost-profit analysis could

be said logically to bar an injunction. If the holder could produce under the patent, it can obtain

a preliminary injunction; if not, it can obtain only any damages awarded after trial.

On the related question of fact, however, nothing in the record suggests that Tate's

capacity situation would prevent it from selling its product to all or substantially all former

Bevel-Edge customers, in the event of an injunction.[4] I have noted that the record is silent as to

the relevant demand elasticities. Interface does not argue that the relative *price* of the accused

panel shows that lost Bevel-Edge customers would turn to Maxcess's Spectrim product or to

other non-patented products.[5] See BIC Leisure Prods. v. Windsurfing Int'l, 1 F.3d 1214, 1218-

19 (Fed. Cir. 1993). On the contrary, the record shows that various participants in the market for

---

legally produced) import does not affect the size of a domestic market if domestic producers are
all at capacity. However, a sale of a patented product is a lost sale to the patent holder,
regardless of the holder's own manufacturing capacity. A patent creates a monopolistic position
for its holder, who may license the patent if dissatisfied with his or her capacity to maximize its
value through production, or even defend his or her right not to produce or license it.

[4] In the absence of a protective order, my analysis of the capacity question would be more
detailed. Because I am convinced that my conclusion is correct, I have left this part of the
opinion vague to avoid disclosing protected information.

[5] Interface does submit evidence that its trimmed panel costs twenty to twenty-five cents
more per square foot than the accused panel. Opp'n Ex. 32 at ¶ 25. This evidence does not
speak to the strength of customers' preference for recessed edges versus square edges on
untrimmed panels.

access floor panels have been adjusting to production delays, in a boom period for all manufacturers of access floor panels, for a considerable period. Interface submits its employee's estimate that demand for access floor panels across the entire market (including Interface) next year will substantially exceed capacity. Opp'n Ex. 32 at ¶ 29. Customers will be waiting no matter what. If even a substantial minority of former customers for Bevel Edge panels switched to Tate's product, either accepting a delay or taking advantage of shifting market conditions, Tate would gain substantially. Tate's loss, without an injunction, would be equally substantial. Accordingly, I find that despite its capacity situation, Tate is losing a significant quantity of orders it would win and fill if Interface's conduct were enjoined.

Interface argues that because Tate offered certain other companies a license under the patent at issue, "this case is really only about money," and the absence of an injunction will not irreparably harm Tate. Opp'n at 36; see High Tech, 49 F.3d at 1557; T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987). Tate says it offered licenses to small companies to settle nuisance suits, and that it has steadfastly refused to offer licenses to serious competitors. Reply at 28. The Maxcess case illustrates the difference in Tate's practice, and Interface has not challenged Tate's distinction among the companies to which it has and has not offered licenses. I find no "pattern of granting licenses under the patent." Polymer, 103 F.3d at 974. The distinction is legitimate in preserving the basis on which procedural presumptions and injunctions are granted, "the emphasis on the right to exclude." T.J. Smith, 821 F.2d at 648.

Interface argues that the access floor panel market is "technologically inactive," suggesting that Tate can wait to get money since any loss of market share is not made more

-24-

disastrous by a market moving around Tate as a first-mover. The converse would be relevant but this does not weigh heavily against an injunction.

Tate argues that the accused panels are of relatively lower quality than its panels, and that it may suffer harm to its reputation. It has submitted no "objective, empirical information" in support of this contention, showing, for instance, confusion in the market. I therefore do not weigh this as a factor in considering irreparable harm. Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc., 908 F.2d 951, 954 (Fed. Cir. 1990).

I find that Interface has failed to prevent evidence persuasive enough to rebut the presumption of irreparable harm. Even if I had found that the Westinghouse evidence barred a presumption of irreparable harm in Tate's favor, I would find that Tate has shown a likelihood of irreparable harm, based on the existence of a market niche for the patented design in particular and the loss of long-term relationships with major customers, beyond the short-term loss of individual sales.

C.

I find that the balance of harms between Tate and Interface weighs only slightly toward Tate. The companies are now both of substantial size. Without an injunction, Tate loses long-term relationship with major customers and loses its position in a market niche for recessed panels. With an injunction crafted to protect existing construction projects in progress, on the other hand, Interface loses less. Even a movant's failure on this factor need not bar a preliminary injunction, Hybritech, 849 F.2d at 1457-58, and my finding that Tate has barely prevailed on this factor will not preclude entry of an injunction, though it does not strongly support one.

-25-

D.

"Typically, in a patent infringement case, although there exists a public interest in protecting rights secured by valid patents, the focus of the district court's public-interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." <u>Hybritech</u>, 849 F.2d at 1458. Where a defendant produced test kits for various diseases, for instance, one district court found that the tests for two diseases tipped the public interest toward the defendant, but enjoined the defendant with respect to tests for various other diseases. <u>Hybritech</u>, 849 F.2d at 1458. No public-health concern is at issue here. Interface argues that an overly broad injunction would disrupt major construction projects and the markets that depend on them, but I will address that concern in framing the injunction, since that harm does not follow from the fact of entering an injunction, as did the harm in <u>Hybritech</u>. In general, access floor panels do not involve a particularly strong public interest beyond the general interest in proper enforcement of patent rights.

For these reasons, I will enter a preliminary injunction addressing Interface's manufacture, sale, and advertisement of the accused panels, after consulting with the parties as to the scope and framing of the injunction.

February 23 , 2001

J. Frederick Motz
United States District Judge