**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| TATE ACCESS FLOORS, INC., and | ) |
| TATE ACCESS FLOORS LEASING, INC. | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| INTERFACE ARCHITECTURAL | ) |
| RESOURCES, INC. | ) |
|  | ) |
| Defendant. | ) |

CIVIL NO. JFM-00-2543

## OPINION

Tate Access Floors, Inc., and Tate Access Floors Leasing, Inc. [collectively "Tate"], have

brought this action against Interface Architectural Resources, Inc. ["Interface"], for infringement

of U.S. Patent No. 4,625,491 [the 491 or Gibson patent], a patent for a design of an access floor

panel with a specific type of trim around its edges.  Previously, Tate successfully asserted rights

under the same patent against a different defendant before this Court and the Federal Circuit.

Tate Access Floors, Inc. v. Maxcess Techs., 222 F.3d 958 (Fed. Cir. 2000) [Maxcess].  On

February 23, 2001, I granted Tate's motion for a preliminary injunction against Interface.  Tate

Access Floors, Inc. v. Interface Architectural Res., Inc., 132 F.Supp.2d 365 (D. Md. 2001), aff'd,

2002 WL 188389 (Fed. Cir. 2002).  Tate has now moved for summary judgement on the issues

of infringement of claims 1-11 of the 491 patent, willfulness and Interface's defenses of prior

invention, anticipation, obviousness, indefiniteness, estoppel and practicing the prior art.

Interface has moved for summary judgment on the issues of infringement of the 491 patent,

1

willfulness and three of its defenses: practicing the prior art, anticipation and obviousness.

Tate's motion is granted in part and denied in part; Interface's motion is denied.

I.

"Elevated floors, also known as 'access floors,' typically include an array of square floor

panels that are supported at their corners by pedestals, thus providing a space underneath the

floor through which wires and other equipment may be routed." Maxcess, 222 F.3d at 961.

Individual panels can be removed for access to equipment between the access floor panels and

the sub-flooring. Access to wiring and other skeletal parts of a building tends to be easier and

less expensive through access floor panels than through walls or ceilings.

The top parts of access floor panels are mounted on steel frames, the construction and

design of which are irrelevant to the patent at issue. In addition to carpeting and vinyl asbestos

tile, the upper surface of access floor panels are commonly made of high pressure laminate, or

HPL. HPL is made of multiple layers of kraft paper, with a top decorative layer and a

transparent layer over that, all forced together under high pressure with resin. See, e.g., 491

Patent, Tate Ex. 1 at col. 3, ll. 18-44. HPL is used in many applications other than access floor

panels.

Frank Gibson applied for the patent Tate now holds on January 13, 1986. Well before

this date, companies including both Tate and Westinghouse, a predecessor of Interface, sold

panels with HPL surfaces. HPL access floor panels were sold almost exclusively, if not

exclusively, with an attached trim around their edges. Tate and Interface dispute whether HPL

floor panels, either with vertical edges or with beveled edges, were sold without edge trim prior

to the Gibson patent. HPL panels with attached trim are still manufactured today. The attached

2

trim is a separate piece of material that covers the sharp, brittle edge of the HPL and prevents chipping and unattractive marks at the edges of panels, but it has several drawbacks. First, it raises the cost and time of production and installation. Second, because the trim is a separate piece, there is a limit on how thin it can be, limiting the manufacturer's ability to create a thinner, more aesthetically pleasing border. When such panels are installed, the attached trim tends to collect water and dirt, and the trim may break or come loose, creating maintenance problems. Finally, the dimensions of the panel can be more accurate when a separate trim is omitted. 491 Patent, Tate Ex. 1 at col. 2, ll. 4-21, col. 2, l. 64 - col. 3, l. 17.

Tate's patented panel, sold under the trade name Integral Trim, has recessed edges but no attached trim. The decorative top layer does not extend horizontally to the outer edge of the panel. Instead the decorative layer is cut away from the edge of the panel, making the edges of lower kraft paper layers that partially constitute the HPL and a wider strip of one kraft paper layer visible around the edges of the panel. Figure 4 in Tate's patent shows that at the edge of the top surface of the panel, there is a flat section of one of the lower kraft paper layers. An angled section revealing the edges of each layer slopes upward from the flat edge to the flat top surface of the panel comprised of the decorative layer with a clear layer on top of it. When a set of Tate's panels are laid together, a person standing on them and looking down sees the black edges of each panel forming a grid.

Tate successfully asserted its rights under the patent at issue against Maxcess Technologies in the District of Maryland and Federal Circuit. Maxcess, 222 F.3d 958. Maxcess's infringing panel, sold under the trade name Duratrim, was flat at the extreme border like Tate's Integral Trim panel. The flat outer edge of Maxcess's panel was brown kraft paper,

3

later painted black. Maxcess argued unsuccessfully to the jury that the 491 patent was invalid based on several theories.[1]

Interface describes its untrimmed accused panel, sold under the trade name Bevel Edge, as "beveled." The extreme edge of the panel is not a flat portion of the lower layer, but an angled cut-away section revealing the edges of each layer, rising to the top layers of the panel, the transparent and decorative layers. The top part of the panel is widest at the bottom and narrowest at the top, with an angled edge. See Tate Ex. 4. In one brochure, Interface advertises the panel as follows: "the top of the high pressure laminate is beveled to create a grid pattern without the use of separate edge trim pieces." Interface brochure, Tate Ex. 10 at IAR/9.

Interface argues that the term "border" in the claims of the patent should be construed to mean only a recessed horizontal border formed of a single layer. Due to the way HPL is made, a border consisting of a single layer would necessarily be flat. Interface's construction of the patent would essentially limit the patent to the embodiment depicted in figure 4 of the patent or very slight variants. It would also exclude Interface's Bevel Edge product. Tate argues, on the other hand, that Interface's proposed construction is inappropriately narrow and contrary to the plain language of the claims, the specification and the prosecution history.

---

[1]Maxcess currently sells an untrimmed access floor panel under the trade name SpecTrim. Tate acknowledges that SpecTrim does not infringe its patent. Baker Dep., Tate Prelim. Inj. Ex. 57 at 10-11. Tate's patented panel has competed with both the accused panel and Maxcess' SpecTrim panel on at least one job. Id. at 74.

II.

Tate and Interface have both moved for summary judgment on the issue of infringement.[2]
Determining whether Interface's Bevel Edge panel infringes Tate's patent is a two-step process.
Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1455 (Fed. Cir. 1988). First, the claims of the
patent must be interpreted, which is a question of law. Second, Interface's panel must be
compared to the properly interpreted claims in order to determine whether it reads on or literally
includes all elements of the patent's claims. The application of the claims to the Bevel Edge
panel is a question of fact. Id.

A.

In interpreting the claims of a patent, "the court should look first to the intrinsic evidence
of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the
prosecution history." Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1992).
In this case, an examination of the intrinsic evidence enables a complete resolution of any
ambiguities in the patent's terms. For this reason, "it is improper to rely on extrinsic evidence."

---

[2]Interface also argues that Tate is estopped from asserting a claims construction which
covers Interface's Bevel Edge product because the prior art is close and because Tate has never
asserted such a claim construction in the past. Interface's "closeness of the prior art" defense is
merely its "practicing the prior art" defense and its invalidity defense in another guise. In
support of its contention that Tate has never asserted a similar claims construction in the past,
Interface offers two pieces of wholly inclusive evidence. First, it points to a sales brochure
issued by Donn, a previous holder of the Gibson patent, that seems to distinguish between
"Integral Trim," which is said in the brochure to be exclusive to Donn, and a "special chamfered
edge" product, about which the brochure is silent as to exclusivity. Second, it relies on one of its
answers to interrogatories in which it identifies a witness who allegedly would testify that
Hitachi Metals sold beveled edged HPL access floor panels in the mid-1980s and was not sued
for infringement. Considered either alone or together, these rather random references are not
sufficient to give rise to an estoppel.

Id.

1.

Claim 1 of Tate's patent covers a panel with "a border along the edges of said panel along which said decorative surface layer is removed to expose said inner body portion and thereby provide an integral contrasting border around said decorative surface layer." The other independent claim, claim 8, similarly describes "a border extending along the edges of said panel along which the decorative layer is removed to expose said inner layer." Tate Ex. 1 at col. 5, ll. 8-11, col. 6, ll. 9-11. The other claims at issue are dependent to these two independent claims and do not assist in determining whether the patent requires the border to be horizontal.

In Maxcess and in affirming the preliminary injunction in this case, the Federal Circuit already has undertaken two independent[3] detailed analyses that construe the terms "integral contrasting border" in claim 1 and "border" in claim 8. In Maxcess, it found that both of these terms mean "an edge or trim formed by removing the edges of the decorative surface layer to uncover or reveal the inner body portion."[4] 228 F.3d at 967, 968. In this case, it held that "[n]othing in the language of these claims requires the 'border' to be horizontal or formed of a

---

[3] In affirming the preliminary injunction, the Federal Circuit specifically stated that it reached its claim construction independently and did not need to decide whether Interface was bound by its claim construction in Maxcess. Interface Architectural Res., 2002 WL 188389, at 10 n.3.

[4] Prior claim constructions, when on point, are given deference under the doctrine of stare decisis in the interest of uniformity and consistency in claim interpretation. Wang Labs., Inc. v. Oki Electric Industry Co., Ltd., 15 F.Supp.2d 166, 175 (D. Mass. 1998). While the Federal Circuit in Maxcess may have been focused on an infringement analysis of a product that differs from Interface's panel, its claim construction directly addresses the clauses at issue here. There is no indication that a different factual context would have caused it to alter its construction of claims 1 and 8.

6

single layer."[5]  It is true, as Interface contends, that in contrast to claim 1's use of the term  "inner

body portion," claim 8 uses the term "inner layer" which is singular and could be read to require

a border made of a single layer, and therefore flat.  However, in Maxcess, the Federal Circuit

construed "inner body portion" and "inner layer" to have the same meaning, "because they are

used interchangeably in the specification."  222 F.3d at 968.  It explained that the term "inner

body portion," and thus the term "inner layer," mean "the layers of laminated material that are

located "rearward," i.e., below, the decorative surface layer, and that contrast in color with the

decorative surface layer."  Id. at 966.  Furthermore, in this case, the Federal Circuit held that in

claim 8, the term "'an inner layer' means one or more layers."  Interface Architectural Res., 2002

WL 188389, at 9.

     The Federal Circuit's constructions of claims 1 and 8 is entirely reasonable and consistent

with the basic principles of claim construction.  To require that the term "border" mean only a

horizontal border would not give "full effect to the ordinary and accustomed meaning" of the

word.  Johnson Worldwide Assocs., Inc. v. Zebco Corp.,175 F.3d 985, 989 (Fed. Cir. 1999); see

also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) ("[I]f

an apparatus claim recites a general structure (e.g., a noun) without limiting that structure to a

specific subset of structures (e.g., with an adjective), we will generally construe the claim to

cover all known types of that structure that are supported by the patent disclosure.").  The

language of claims 1 and 8 does not support Interface's proposed construction.

---

     [5] The Federal Circuit's claim construction is useful to my analysis, but it was done on
review of a preliminary injunction, and, therefore, is not dispositive on this motion for summary
judgment.  See CVI/Beta Ventures, Inc., 112 F.3d at 1160 n.7 (explaining that a preliminary
injunction opinion is based on an incomplete record and only reaches tentative conclusions)

2.

The patent's specification also does not further Interface's proposed claim construction. Although the claims should be read in light of the specification, a court should not read a limitation from the specification into the claim. See, e.g., Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998). The patent's summary of the invention says that "the surface layer of protective material and the layer of decorative paper are cut away along the edge of the floor covering to expose the inner layers and provide a contrasting color integral border." Tate. Ex. 1 at col 1, l. 67. The reference to "expos[ing] the inner layers" does not support Interface's reading that one layer must be particularly exposed or that the contrasting border must be flat. Interface's argument that the arrow numbered 14 in figure 4 of the patent, labeled "border or trim," Tate Ex. 1 at col. 2, l. 54, points to the horizontal part of the edge, not the angled part sloping up to the top decorative layer, is inconclusive at best. See 37 CFR 1.84(r)(1) (explaining that "[o]n a lead line, a freestanding arrow indicate[s] the entire section towards which it points."); Cline Dep., Tate Ex. 16 at 53 (stating that 14 points to the horizontal and angular surface). In addition, figure 4 is merely a preferred embodiment of the invention, not the only one. Tate Ex. 1 at col. 3, l. 45 ("As best illustrated in FIG. 4 . . . .").

Interface claims that the patent's specification only disclosed the rabbet shaped edge configuration of the preferred embodiment and did not disclose a beveled edge configuration. For this reason, it asserts that the claim should be limited to the border shape described in the preferred embodiment. See Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1480 (Fed. Cir. 1998) ("An applicant is entitled to claims as broad as the prior art and his disclosure will allow.") (citation and quotation omitted) (emphasis in original); Hoganas AB v. Dresser Indus.,

Inc., 9 F.3d 948, 951 (Fed. Cir. 1993) ("Where there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning, we consider the notice function of the claim to be best served by adopting the narrower meaning.")

Interface is incorrect; the specification does disclose a beveled edge. In addition to the preferred embodiment likely having a section of its border created by a beveled edge, the specification teaches to scarf or cut away the floor covering, which would be satisfied by beveling. See Gibson Dep., Tate Ex. 78 at 82-85 (stating that scarfed and beveled are both engineering terms that mean to cut away); Spielman Dep., Tate Ex. 70 at 45-47, 49, 54-56 (explaining that scarfing or chamfering produce a beveled edge); Cline I Dep., Tate Ex. 16 at 49-51 (explaining that beveling is making an angular cut and that scarfing is a broad term that is any kind of shallow cut not through the entire surface). As Interface's own experts have acknowledged, a worker with ordinary skill in the art would be able to read the patent and understand that its purpose could be accomplished with a variety of cuts and shapes. Wiebe Dep., Tate Ex. 69 at 11-12 (stating that claims 1 and 8 of the patent do not require the border to be a horizontal surface or have a specific shape); Spielman Dep., Tate Ex. 70 at. 63-67 (same).

3.

Finally, the prosecution history does not compel Interface's restrictive construction of the patent. The patent examiner who approved Tate's patent considered prior patents involving HPL with angled edges: one granted in 1960, U.S. Patent No. 2,957,737, Interface Ex. 11, and one granted in 1955, U.S. Patent No. 2,717,187, Interface Ex. 57. The 1960 patent involved a way to finish the edges of table or desk tops made of HPL by attaching an additional layer at the edge.

The patent explains that the edge layer should be angled to reduce "feathering" of the HPL layers and that the difference in color "lends a decorative effect." The 1955 patent shows a beveled HPL top on a table with a lower edging that sticks out further than the edge of the HPL. In addition, the examiner reviewed a prior British patent, U.K. Patent No. 429,301. This invention involved a way to attach edging to a metal desk or table top, the edging of which "may be suitably rounded off to impart a finish to the desk or table." Interface Ex. 58 at col. 2, ll. 24-25. The examiner also considered several prior patents on other aspects of access floor panels, one of which showed a separate trim edging around the top of the panel. U.S. Patent No. 3,696,578, Interface Ex. 5. The patent examiner approved the application, giving a one-sentence explanation that the "references of record fail to show an integral trim exposing a lower decorative layer." File History for 491 Patent, Interface Ex. 2.

Focusing on this single sentence, Interface argues that an angled edge does not create "a . . . layer" at all, since it is composed of the edges of many layers of kraft paper. However, the Federal Circuit's ruling that the terms "inner body portion" and "inner layer" mean one or more layers undercuts this argument. Moreover, the examiner himself used the word "lower," not the more restrictive "horizontal," in describing the exposed "layer." Thus, his language provides scant basis for inferring that he was using the word "layer" in the manner ascribed to him by Interface.

B.

Having interpreted Tate's patent claims, I must now determine whether Interface's panel

10

literally infringes those claims.[6]  That determination is easy to make since Interface's witnesses

virtually, if not expressly, concede that if Tate's claims construction is correct, Interface's Bevel

Edge panel literally reads on claims 1 and 8.[7]  Wiebe Dep., Tate Ex. 69 at 5-10, 64-65

(acknowledging that Bevel Edge panels remove the decorative surface layer to expose the inner

kraft paper layers and create a contrasting border), Spielman Dep., Tate Ex. 70 at 57, 71-72, 116-

17 (same); Doris Dep., Tate Ex. 71 at 30-32, 63-64 (same), Sainato Dep., Ex. 13 at 65-74 (same).

In addition, Interface has not contested the fact that its product meets the additional requirements

of claims 2-7 and 9-11.  Based on this evidence, no reasonable jury could find that Interface did

not infringe claims 1-11.

III.

Interface claims that it has an affirmative defense to Tate's claim of infringement because

it was merely practicing the prior art.  The Federal Circuit has made it "unequivocally clear . . .

that there is no 'practicing the prior art' defense to literal infringement."    Interface Architectural

Res., 2002 WL 188389, at 6 (citing Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575,

---

[6] Tate has not pursued an infringement theory under the doctrine of equivalents so a literal infringement theory is the only one that need be considered.

[7] Interface argues that summary judgment should be denied because not all of its panels actually were beveled due to quality control problems.  See Votolato Dep., Interface Ex. 53 at 33-40 (explaining that there were no written standards and grinding depth was controlled by humans rather than machines.)  However, Interface's infringement was complete with its offer to sell the infringing panels, 35 U.S.C. § 271(a), which they did in their sales materials.  See Tate Ex. 10 at IAR/9.  Furthermore, it is Interface's burden to establish  how many of its panels infringed or else it bears the whole risk. Nickson Industries, Inc. v. Rol Mfg. Co., Ltd., 847 F.2d 795, 799 (Fed. Cir. 1988) ("[W]here it is impossible to make a mathematical or approximate apportionment" between infringing and noninfringing items, the infringer must bear the burden and the entire risk.")

1583 (Fed. Cir. 1995)). Tate's motion for summary judgment on this issue will be granted.

## IV.

In addition to its affirmative defense of practicing the prior art, Interface has also asserted

four theories for invalidating the Gibson patent - prior invention, indefiniteness, anticipation and

obviousness.[8] The 491 patent is presumed valid and it is Interface's burden to establish

invalidity by clear and convincing evidence. Ruiz v. A.B. Chance Co., 234 F.3d 654, 662 (Fed.

Cir. 2000). Interface has failed to meet its burden on all four of its theories.

## A.

Interface asserts that Alwyn Wiebe actually invented the 491 patent, thus invalidating it

under 35 U.S.C. § 102. Wiebe states that he first presented the idea for the integral edge access

floor panel to Frank Gibson and several other Donn employees when they met with him and

other Formica employees on August 31, 1983, which would be prior to Gibson's claimed date of

invention. Wiebe Decl., Interface Ex. 70 at ¶ 20. However, the issuance of the 491 patent with

Gibson as the named inventor creates a presumption that he is the actual, and only, inventor.

Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("Patent issuance

creates a presumption that the named inventors are the true and only inventors.")

In order to prove prior invention, Interface must offer evidence to corroborate Wiebe's

---

[8] Maxcess made similar invalidity arguments to those offered by Interface. The jury found against Maxcess on all of its theories of invalidity. Special Verdict Form, Tate Ex. 8. However, a verdict against Maxcess regarding invalidity does not preclude Interface from relitigating the issue. Mendenhall v. Cedarapids, Inc., 5 F.3d 1557, 1569 (Fed. Cir. 1993) (holding that "the factual findings and legal conclusions" in a previous infringement action against a different defendant "cannot be used as a collateral estoppel against defendants who were not parties to that case" but that it does inform the court "that caution must be taken in reaching a contrary legal conclusion").

claim. Finnigan Corp. v. Int'l Trade Com'n, 180 F.3d 1354, 1366 (Fed. Cir. 1999) ("[O]ral testimony by an alleged inventor asserting priority over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence.") (citations and quotation omitted). Wiebe claims that he wrote a follow-up memo on September 2, 1983 to memorialize the August 31 meeting, but Interface has not produced it. Instead, Interface offers a page from Wiebe's lab notebook documenting the invention. See Interface Ex. 71. However, this page of the lab notebook is dated July 16, 1984, giving it no value as support for Wiebe's claim. See Wiebe Dep, Tate Ex. 24 at 76-78, 105 (explaining that he recorded potentially patentable ideas in his lab notebook).

In addition, Wiebe claims that Donn was "quite exuberant" when he suggested the integral trim panel. Wiebe Dep., Tate Ex. 23 at 35. Despite this, the evidence presented by Tate that documents the development of the integral trim design suggest that it was not until several months after the August 31 meeting that Donn and Formica began experimenting with the idea. See Tate Exs. 45-68. Casting further doubt on Wiebe's story, Formica has never made a claim of inventorship or challenged the validity of the patent even though Wiebe made them aware of his claim that he invented the integral trim panel. See Wiebe Dep., Tate Ex. 24 at 117-18 (saying that Formica considered legal action); Wiebe Decl., Tate Ex. 26 at ¶¶ 15-18 (saying that he discussed legal options with Formica). Based on the present record viewed as a whole, no reasonable jury could find by clear and convincing evidence that Wiebe was the prior inventor of the 491 patent. See Sandt Tech., Ltd. v. Resco Metal and Plastics Corp., 2001 WL 1013367, at *7 (Fed Cir. 2001) ("'[A] 'rule of reason' analysis is applied to determine whether an inventor's testimony . . . has been corroborated.' In applying the "rule of reason" test, 'all pertinent

13

evidence' is examined in order to determine whether the 'inventor's story' is credible." (quoting Price v. Symsek, 988 F.2d 1187, 1195 (Fed. Cir. 1993))).

B.

Interface also argues that the Gibson patent is invalid due to indefiniteness.  35 U.S.C. § 112(2) requires a specification to include claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  The Federal Circuit has explained how to evaluate this requirement: "Determining whether a claim is definite requires an analysis of 'whether one skilled in the art would understand the bounds of the claim when read in light of the specification . . .. If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.'"  Personalized Media Communications, LLC v. Int'l Trade Com'n, 161 F.3d 696, 705 (Fed. Cir. 1998) (quoting Miles Lab., Inc. v. Shandon, Inc., 997 F.2d 870, 875 (Fed.Cir.1993)). Such a determination "is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  Id.

Interface bases its indefiniteness argument on the fact that Tate's experts disagreed about how to interpret the claims of the patent.  Interface gave Gibson and Cline the same four samples of its beveled edge product with varying degrees of beveling.  The samples had a very minor bevel or none at all.  Cline felt that these four samples did not infringe because no visible trim had been created by the removal of the decorative surface and the exposure of the inner layers of kraft paper.  Cline II Dep., Interface Ex. 38 at 224-226.  Gibson stated that he could not tell whether they infringed without using a measuring device to determine whether the panels had vertical or angled edges, implying that an angled edge of any degree would infringe.  Gibson

14

Dep., Interface Ex. 42 at 141-45. This evidence of disagreement in interpreting the claims of the patent does not prove indefiniteness. Exxon Research and Eng'g Co. v. U.S., 265 F.3d 1371, 1375 (Fed Cir. 2001) ("If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.").

C.

Next, Interface argues that Tate's patent is invalid because it is anticipated by the prior art. For a claim to be anticipated, "each and every limitation" must be found "either expressly or inherently in a single prior art reference." Celeritas Techs. Ltd. v. Rockwell Intl. Corp., 150 F.3d 1354, 1360 (Fed. Cir.1998). In addition, "the reference must also enable one of skill in the art to make and use the claimed invention." Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368, 1374 (Fed. Cir. 2001).

Interface first contends that Tate's construction of the patent is so broad that it would cover any monolithic HPL panel, even one with a strictly vertical edge, and that such panels were in existence prior to the Gibson invention.[9] Tate disputes the latter fact. I need not resolve that dispute, however, because I find that Tate's claim construction does not cover panels with strictly vertical edges because such panels do not create a contrasting border when viewed from above.

Interface next contends that beveled edge panels also existed prior to the Gibson invention. To support this contention, Interface has produced several pieces of evidence, including prior art that was not reviewed by the patent examiner.

---

[9]The parties agree that the definition of a "monolithic panel" is a panel where the HPL extends to its edge.

15

Interface's predecessor, Westinghouse, sold trimmed panels before Gibson filed his patent application, but the evidence as to whether it sold untrimmed panels is conflicting. Richard Talcott, who worked as materials manager and in other positions at Interface or its predecessors, including Westinghouse, describes hand-beveling the edges of HPL at an angle of about forty-five degrees. The beveling removed some of the top decorative layer of paper and revealed some kraft paper. Talcott also declares that "[a]n extruded plastic trim strip was typically, but not invariably, applied to the panel edge." Talcott Decl., Interface Ex. 65 at ¶¶ 9-11, 16; see also Talcott Dep., Tate Ex. 84 at 19, 23. Talcott's statement is supported by the statement of Dr. David Baldwin who was General Manager of Westinghouse's Micarta and Architectural Systems divisions. He states that Westinghouse sold beveled edge HPL panels in the 1970's. Baldwin Decl., Interface Ex. 35 at ¶¶ 23-24.[10] Notably, however, neither Talcott nor Baldwin have any documentation or specific product details to support their assertions. Talcott Dep., Tate Ex. 84, pp 26-27, 34-35 (stating that there is no documentation to verify his story that beveled panels existed).

A former sales manager of Interface and its predecessors, Thomas D. Bougie, had responsibility for selling access floor panels for Interface and its predecessors from 1967 to 1999. Bougie testified that the only untrimmed panels he sold were topped with carpet, not laminate.

_____

[10] Tate argues that Baldwin's statement should be given no weight because he told Tate's attorney that he was in poor health and did not want to be involved in the case. Baldwin acknowledges that he told Tate's attorneys that he was in poor health and was not available to testify in court or by deposition, but not that he would not get involved in the case. Baldwin II Decl., Interface Ex. 68 at ¶ 3. While I have considered the testimony of Dr. Baldwin for purposes of deciding the present motion, Interface's attorneys must assist in having him be available in some way for cross-examination if they want to use his testimony for any other purpose.

Bougie said that HPL panels sold by Westinghouse were beveled to be widest at the top, to create an air-tight seal to insulate the air conditioning in the computer rooms in which the panels are typically used. Bougie Decl., Tate Ex. 27 at ¶¶ 7-11; Bougie Dep., Tate Ex. 36 at 46-54, 71-72, 78-82, 98-99. Interface argues that Bougie's knowledge was limited because he was employed by Westinghouse only in a sales capacity. However, Talcott, one of Interface's own witnesses, acknowledges that Bougie was familiar with the entire Westinghouse product line. Talcott Dep., Tate Ex. 84 at 33. Moreover, Interface has offered no plausible explanation for why the product described by Talcott and Baldwin was discontinued, nor why it was not reintroduced by Interface or others to compete with products sold by the holders of the 491 patent over the years. See Sainato Dep., Tate Ex. 13 at 11-18, 95-96, 102-03 (stating that while he was an executive at Tate, he did not consider reintroducing a trimless beveled edge panel to compete with products manufactured by the holder of the 491 patent at that time).

Another factor that draws the accuracy of Talcott's and Baldwin's recollections into question is that the available written evidence does not show sales of an untrimmed HPL panel beveled like the accused panel. The brochure advertising the Westinghouse panels specifies that "[a]n extruded trim edge of fire retardant rigid vinyl flush with the surface of the floor covering shall completely encase the edge of the panel." Tate Ex. 14 at IP0000195. Although the fire-retardant covering might have been necessary because the bases of the panels were then made of wood, the description of the covering as "flush with the surface of the floor covering" is precise. The advertisement further emphasizes that the panels' "[v]inyl edges butt together precisely to form an air-tight air conditioning plenum." Tate Ex. 14 at IP0000193.

Interface presents three other pieces of evidence to support the existence of beveled edge

17

panels prior to the Gibson patent.  First, it offers the claim by Willem Ridders, a former Tate

sales employee, that the H.H. Robertson Company sold beveled edge HPL panels in 1984.

Ridders Decl., Interface Ex. 36 at ¶ 7.  However, Ridders actually stated that the panels

necessarily would have been beveled based on his experience, not that he actually knew that they

were beveled.  Moreover, casting serious doubt on Ridders testimony is the Robertson brochure,

which depicts panels with add-on edges and specifically states that all surfaces are covered with a

protective edging material.  See Interface Ex. 13 at IP0012549.  Second, Interface offers the

statement of William Raschen, an access flooring installer, who claims that he would bevel the

edges of HPL panels in the field during installation.  Raschen Dep., Interface Ex. 48 at 87-91.

However, Raschen does not state that his beveling exposed contrasting inner layers of kraft paper

to create an integral border.  Third, Interface submits evidence that vertical monolithic HPL

panels inherently included a beveled edge.  Cline II Dep., Interface Ex. 38 at 249-50 (stating that

panels are not perfectly vertical when manufactured); Gibson Dep., Interface Ex. 42 at 150-53

(acknowledging tolerances of machining).  Again, however, assuming that monolithic panels

existed at the relevant time, Interface has presented no evidence to suggest that such minor

variations from vertical would have created an integral contrasting border made up of the inner

layers of kraft paper.

    In sum, viewing the evidence in the light most favorable to Interface, no reasonable jury

could find by clear and convincing evidence on this record that beveled edge HPL panels existed

prior to the Gibson invention.  Tate's motion for summary judgment on Interface's anticipation

defense will therefore be granted.

D.

Finally, Interface argues that the 491 patent is invalid due to obviousness. A claimed invention is unpatentable due to obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). The Federal Circuit has explained:

> In order to determine obviousness as a legal matter, four factual inquiries must be made concerning: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; 3) the differences between the claimed invention and the prior art; and 4) secondary considerations of nonobviousness, which in case law is often said to include commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results.

Ruiz, 234 F.3d at 662-63. Each of these factors will be considered in turn.

1.

Interface argues that the prior art includes monolithic HPL panels and woodworking textbooks that taught, without specific reference to access floor panels, the desirability of cutting the edges of HPL at an angle (by a process known as beveling, chamfering or routing) to prevent splintering, chipping, and damage from sharp perpendicular edges. See Interface Exs. 14-17, 19. This woodworking technique was also known to have an aesthetic purpose. Gibson Dep., Interface Ex. 42 at 157-158 (stating that he beveled the HPL on his kitchen countertop for decorative purposes).

Tate argues that it is not appropriate to consider woodworking references that are not

specifically directed at access floor panels.[11]  Tate contends that there are significant differences

between access floor panels and other surfaces covered by HPL.  See Cline II Dep., Tate Ex. 35

at 189-192 (explaining that HPL in access flooring is different from in cabinets and other

woodworking because of its thickness, electrical properties and its need to withstand modular

movements); Gibson Dep., Tate Ex. 78 at 124-127, 159-165 (stating same plus the fact that

access floors bear a much heavier load).  However, Gibson offered, and the Patent Office

considered, other woodworking as part of the relevant prior art when it reviewed his patent

application.  See Exs. 2, 5-11, 56-58.  In addition, Tate's expert has stated that access floor

engineers would have seen instructions from HPL manufacturers to work HPL with ordinary

woodworking techniques.  See Cline II Dep., Interface Ex. 38 at 216-220.  Under these

circumstances, it is appropriate to consider prior art woodworking references from outside the

access flooring context.

　　　　Interface attempts to extend the prior art an additional step by contending that the

National Electrical Manufacturers Association [NEMA] standard that instructed a worker to

"[c]hamfer all exposed edges of decorative laminates by filing to prevent possible damage by

chipping" was directed at, and followed by, access floor manufacturers prior to the Gibson

invention.  Interface Ex. 26 at 14.  While both parties' witnesses agree that the NEMA standards

as they related to electrical conductivity were relevant to access flooring, there is scant evidence

in the record to support the argument that the NEMA instruction to chamfer the edges of HPL

───────────────

[11]As indicated above, Tate also contests the existence of monolithic HPL panels prior to
the Gibson invention.  Again, I need not resolve that question since, assuming their prior
existence, I still do not find the invention to have been obvious.

was considered relevant to access flooring. See Votolato Dep., Interface Ex, 53 at 100 (stating

that he is familiar with the NEMA standards at least for electrical conductivity); Gibson Dep.,

Interface Ex. 42 at 154-55 (stating that NEMA standard was only relevant to electrical properties

of panels); Miarka Dep., Interface Ex. 45 at 110-11 (stating that access flooring people were not

really concerned with the NEMA standards); Talcott Dep., Interface Ex. 52 at 55 (stating that he

had read the NEMA standards in general while working at Westinghouse). In addition, Interface

has argued that following the NEMA standards would have removed the decorative layer to

expose the inner kraft paper layers. Baldwin II Decl., Interface Ex. 68 at ¶ 6 (stating that NEMA

standard would have led to exposed craft paper because decorative layer is thin); see also Cline II

Dep., Interface Ex. 38 at 228-229 (stating that following the NEMA standards might infringe the

Gibson patent). Given this, the very fact that Gibson did not develop his invention for more than

ten years after the NEMA standards were issued demonstrates that the access flooring industry

did not consider this NEMA instruction to be relevant.

2.

Steven Cline, Tate's expert, has opined that a person with the ordinary level of skill in the

art is someone in "either the manufacturing or product engineering disciplines" with at least two

years experience designing access flooring and accessories. Cline II Dep, Interface Ex. 38 at

182-83. Interface has agreed for purposes of its motion that it would accept the validity of this

opinion. Interface Br. at 41.

A person with the ordinary level of skill in the art is presumed to know all of the relevant

prior art. Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc., 807 F.2d 955, 962 (Fed. Cir.

1986). The relatively low level of skill posited by Cline for the hypothetical artisan in this case

"renders even minor non-obvious advances in the art patentable." Buildex Inc. v. Kason Indus., Inc., 665 F. Supp. 1021, 1028 (E.D.N.Y. 1987), rev'd on other grounds, 849 F.2d 1461 (Fed. Cir. 1988).

3.

The difference between the Gibson invention and the prior art is the removing of the top decorative surface layer of an HPL access floor panel to expose the contrasting inner kraft paper layers of the HPL and therefore form an integral border. See Gibson Dep., Tate Ex. 78 at 44-45. As noted previously, this eliminated the need for the addition of a separate protective vinyl edge.

4.

In addition to the primary considerations discussed above, secondary considerations must be considered before determining whether the Gibson patent was obvious. While designated as secondary, these considerations are just as important as the primary considerations. Ryko Mfg. Co. v. Nu-Star, Inc., 950 F.2d 714, 719 (Fed. Cir. 1991) ("[S]econdary considerations are not secondary in importance to primary considerations; we simply hold that a court is entitled to weigh all the considerations, primary and secondary, and then render its decision."). Tate has offered compelling evidence regarding the secondary considerations of commercial success, long felt but unresolved need and copying.

a.

Tate's Integral Trim panel has been a commercial success, garnering significant sales in the access flooring market. It is presumed that this success is due to its integral trim feature. J.T. Eaton & Co., Inc. v. Atlantic Paste & Glue Co., 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant

22

market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention."). Interface has the burden of showing that the commercial success of the Integral Trim panel is due to factors independent of the patent. See id. ("If a patentee makes the requisite showing of nexus between commercial success and the patented invention, the burden shifts to the challenger to prove that the commercial success is instead due to other factors extraneous to the patented invention, such as advertising or superior workmanship.").

In an effort to meet its burden, Interface has cited the testimony of Tate salesman Bougie that the market for Tate's product is as big as he can make it. Bougie Dep, Interface Ex. 37 at 159-164. Interface claims that this proves that the success of the product is due to marketing acumen rather than the trimless feature of the panel. However, Bougie's statement when viewed in the context of all of his testimony and the testimony of several other people from all aspects of the access flooring industry actually reveals that his marketing efforts were successful because of the integral trim feature of the panel. Bougie Dep., Tate Ex 36 at 133, 134, 139, 142-44 (stating that it was difficult to compete against an Integral Trim product and some customers insisted on it); Cline Dep., Tate Ex. 35 at 84-87, 89-92, 103-04 (stating that dealers were overjoyed by the introduction of Integral Trim and that some specifications demanded it); Raschen Dep., Tate Ex. 87 at 21-22, 41, 51, 69-70 (stating that some customers insisted on a trimless product); Gilfillan Dep., Tate Ex. 86 at 74-76, 179-81 (stating that repeat customers want a trimless product and that trim is the key issue when purchasing HPL panels); Sainato Dep., Tate Ex. 13 at 8-9, 11-14, 91-93 (stating his opinion that the Integral Trim product was commercially successful because it overcame the add-on trim problem).

23

Next, Interface argues that Maxcess has replaced its infringing Duratrim product with a new product with no commercial consequences. See Miarka Dep., Interface Ex. 45 at 18-22 (stating that most end-user customers did not care about the change so long as the trim stayed on). However, Maxcess' corporate representative acknowledged that the two products which it began selling to replace the Duratrim panel, the Monolithic and Duratrim 2000, were not successful. Miarka Dep, Tate Ex. 85 at 27, 31-34, 43-45, 77. In addition, Maxcess' success with the SpectaTrim product, a non-infringing panel that does not have add-on trim, suggests that there is a nexus between commercial success and the elimination of add-on trim. Terry Musika, a certified public accountant, confirms that Interface and Maxcess have not lost sales volume, but he points to several other factors, including price, that may account for this fact. Musika Dep., Tate Ex. 88 at 58-60, 205-206, 251-52.

Finally, Interface produced two customers who stated that they did not care about the trim on the panels they bought. Hahn Dep., Interface Ex. 43 at 18; Kern Dep., Interface Ex. 44 at 12. However, both of these customers also stated that time was their primary concern when making their purchasing decision. Hahn Dep., Tate Ex. 94., pg 35 (stating that there were unusual time constraints on project); Kern Dep., Interface Ex. 44 at 12. Their testimony is insufficient to meet Interface's burden of overcoming Tate's strong evidence of the commercial success of its Integral Trim product.

b.

As described above, access floor panels with an HPL surface were sharp and susceptible to cracking and chipping. For this reason, manufacturers added a separate trim piece to protect the edge. However, this add-on trim was not ideal because it could come off relatively easily and

24

created a groove where dirt and moisture could collect. This had long been seen as a problem in the access flooring industry, yet no satisfactory solution had been found. The Gibson invention resolved this long-felt but unresolved need. Even, Interface's President acknowledges this fact. Sainato Dep., Tate Ex. 13 at 11-14, 92-93.

c.

While Interface did not copy the Tate patent, several competitors did. As has been discussed, Tate enforced its rights against Maxcess who was marketing a product that was nearly identical to Tate's product. In addition, Bravo also made an access flooring panel that copied Tate's product. Bravo settled with Tate and then licensed rights to the patent. See Tate Ex. 92. Finally, Interface's president, Victor Sainato, describes a product that was made by Atlantic Access Flooring prior to its acquisition by Interface. Atlantic stopped making the product when it was in negotiations to be acquired by Interface. From Sainato's description, it seems that this panel also copied Tate's Integral Trim panel. See Sainato II Dep, Tate Ex. 13 at 40-41.

In summary, while on first impression it might appear that the prior art would favor finding the Gibson patent obvious, upon analysis it becomes clear that this is a case where "the genius of invention is . . . a combination of known elements which in hindsight seems preordained." McGinley v. Franklin Sports, Inc., 262 F.3d 1339, 1351 (Fed. Cir. 2001) (quoting Gambro Lundia AB v. Baxter Healthcare Corp., 110 F.3d 1573, 1579 (Fed. Cir. 1997). Any doubt on that score is dispelled by the overwhelming evidence of secondary considerations. See Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1538-39 (Fed. Cir. 1983) ("Indeed, evidence of secondary considerations may often be the most probative and cogent evidence in the record. It may often establish that an invention appearing to have been obvious in light of the prior art

25

was not."). Tate's Integral Trim product is commercially successful, met a long-felt need in the access flooring industry, and it has been copied by its competitors. Simply put, if the Gibson invention was truly obvious in light of the longstanding prior art, it certainly would have been invented earlier.

V.

Both Tate and Interface have moved for summary judgment on willful infringement. To determine willful infringement, one must consider "whether a prudent person would have had sound reason to believe that the patent was not infringed or was invalid or unenforceable, and would be so held if litigated." SRI Intern., Inc. v. Advanced Tech. Labs., Inc., 127 F.3d 1462, 1464 (Fed. Cir. 1997). This is a question of fact "and must be established by clear and convincing evidence, for the boundary between unintentional and culpable acts is not always bright." Id. (citation and quotation omitted).

Interface argues that its employees undertook a good faith investigation and concluded that its proposed product did not conflict with Tate's patent. This investigation was undertaken by three executives at Interface: Victor Sainato, John Doris and Frank Votolato. All three of them had extensive experience in the industry, were familiar with historical and current competitive products and had knowledge of the patent. According to them, the primary reason they believed that Interface's product would not conflict with the 491 patent was their belief that a beveled edge HPL panel was either an incremental change from the prior art that was suggested by common woodworking instructions or simply a reintroduction of a previous product. In addition, they believed that sanding the HPL rather than cutting it would not violate the Gibson patent and that the Interface product would be borderless. See Doris Dep., Interface Ex. 39 at 56-

57, 63, 66, 126-127, 135; Votolato Dep., Interface Ex. 53 at 131-132; Sainato II Dep., Interface Ex. 51 at 71-72.

Tate partially discredits this testimony with evidence of an Interface brochure that touts its Bevel Edge product as creating a grid pattern without the use of separate edge trim pieces. Tate Ex 10. at IAR/9. In addition, Tate cites to testimony by the same Interface executives that they knew their product created a visible trim around its edges. Votolato Dep., Tate Ex. 82 at 51-52 (stating that Interface product does not create a trim effect because it is not wide enough or the right color but does acknowledge that it is visible); Sainato Dep., Tate Ex. 13 at 58 (explaining that grid is formed by beveled edge). Further tarnishing the investigation and decision made by the Interface executives is their lack of consideration of the Maxcess opinion and their questionable qualifications to interpret a patent. See Votolato Dep., Tate Ex. 82 at 71-72 (expressing belief that Maxcess lost because it had bad lawyers and acknowledging that it did not know what the Maxcess opinion held), Doris Dep., Tate Ex. 71 at 34-35, 46-47, 51, 53, 56, 74-78 (acknowledging that both Tate and Interface's products produce an integral border effect and that he relied on preferred embodiment to determine scope of claim); Sainato I Dep., Tate Ex. 13 at 108, 116-121, 128-31, 142 (stating that he had no prior experience interpreting patents and that he did not consider the Maxcess opinion).

In addition to the investigation its executives conducted, Interface asserts two other reasons to demonstrate its use of care and reasonableness. First, it argues that it was reasonable to proceed because Tate knew about its product and had not done anything about it. However, Tate needed an actual sample of the panel in order to do a claims analysis before it could proceed. View Eng'g, Inc. v. Robotic Vision Sys., Inc., 208 F.3d 981 (Fed. Cir. 2000)

(permitting sanctions against law firm that made infringement claim without doing a claims analysis). Once it actually had a sample, it did not delay in taking action. Second, Interface argues that it tried to avoid conflict with Tate over the Gibson patent when it acquired Atlantic Access Flooring. See Sainato I Dep., Interface Ex. 50 at 41-42; Votolato Dep., Interface Ex. 53 at 28. The fact that Interface was concerned about violating Tate's patent on a different occasion does bolster its contention that it truly believed that the Bevel Edge product did not violate the patent. However, it does not confirm that this belief was a reasonable one.

Finally, Interface argues that the two independent opinions of counsel they obtained regarding infringement demonstrate the care they took and the reasonableness of their actions.[12] Interface contacted its patent counsel, Mr. John Pratt, as soon as it heard that Tate was considering an infringement action. Doris Dep., Interface Ex. 39 at 86. Pratt discussed the patent issue with Doris, Sainato and Votolato and then gave them his opinion orally and in a brief e-mail. Sainato II Dep., Ex. 51 at 14-15. Pratt's opinion was that the Interface panel did not infringe in light of the prior art. Pratt Dep., Interface Ex. 75 at 27-28, 35-36, 40-41, 43-44. Tate attacks Pratt's opinion as insufficient because it was less than a page in length, did not

---

[12] Tate argues that Interface's failure to get an opinion from counsel prior to beginning its infringement is a per se breach of its duty of due care. Underwater Devices Inc. v. Morrison-Knudsen Co., Inc., 717 F.2d 1380, 1389-1390 (Fed. Cir. 1983) ("Where, as here, a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. Such an affirmative duty includes, inter alia, the duty to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity.") (citation and quotation omitted). While it may have been prudent to get the opinion of counsel earlier, Interface did not necessarily breach its duty by its failure to do so. Nickson Industries, Inc., 847 F.2d 795, 799-800 (Fed. Cir. 1988) ("Absence of an opinion of counsel, however, does not in every case require a finding of bad faith.").

mention the Maxcess decision and did not have a claim by claim comparison of the two panels. See Jurgens v. CBK, Ltd., 80 F.3d 1566, 1572 (Fed. Cir. 1996) ("To reasonably rely on an opinion, it must be authoritative, not just conclusory, and objective."). While the brevity of Pratt's opinion is a concern, Tate's concerns about Pratt's qualifications and review of the relevant materials seems unfounded. Pratt clearly has extensive experience with HPL and had reviewed the panels, the patent, the prior art and the relevant caselaw. See Pratt Decl., Interface Ex. 69 at ¶¶ 5-20 (describing Pratt's extensive experience with HPL and woodworking and the steps he took before giving Interface his opinion).[13]

While the investigation and analysis by Interface's executives was flawed and Pratt's opinion was brief, reasonable persons could disagree about whether Tate has proven willful infringement on this record. Even though Interface has not met its burden of proof on obviousness or anticipation, Doris, Votolato and Sainato seem convinced that the Interface panel was an incremental change from existing prior art or the reintroduction of a past product. Pratt also came to the same conclusion. On this record it is for a jury to determine "whether a prudent person would have had sound reason to believe that the patent was not infringed or was invalid or unenforceable, and would be so held if litigated." SRI Intern., Inc., 127 F.3d at 1464.

---

[13] Interface also obtained a second non-infringement opinion from Julian Dority. Dority Dep., Interface Ex. 74 at 16, 26-27, 30, 35-36; Dority Infringement Opinion, Interface Ex. 22. This opinion is of limited relevance in determining whether Interface's infringement was willful as it was obtained after Interface had already ceased its infringement.

A separate order effecting the rulings made in this opinion is being attached herewith.

Date: _____                    _____
                                                    J. Frederick Motz
                                                    United States District Judge